## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## (KANSAS CITY)

| | |
|---|---|
| KATHRYN LASK, | ) |
| | ) |
|        Plaintiffs, | ) |
| v. | )     **Case No.** |
| | ) |
| | ) |
| KANSAS CITY KANSAS COMMUNITY | ) |
| COLLEGE, | ) |
| | ) |
| and | ) |
| | ) |
| THE BOARD OF TRUSTEES | ) |
| OF KANSAS CITY KANSAS COMMUNITY | ) |
| COLLEGE | ) |
| | ) |
|        Defendants. | ) |
| | ) |

## COMPLAINT

COMES NOW, Plaintiff Kathryn Lask ("Plaintiff" or "Lask"), by and through her counsel of record, and for her claims against Defendants Kansas City Kansas Community College ("Defendant KCKCC", "KCKCC" or the "College") and Board of Trustees of Kansas City Kansas Community College ("Defendant Board") (collectively "Defendants"), states the following:

## PARTIES

1.    Plaintiff Kathryn Lask is a female and a Kansas resident, residing in Overland Park, Johnson County, Kansas. At all times relevant, Plaintiff was and is an employee of Defendant KCKCC.

2.    Defendant KCKCC is a public community college organized under the laws of Kansas, and, at all times relevant, has been authorized to conduct business in the state of Kansas, whose principal place of business is located at 7250 State Ave., Kansas City, Kansas, 66112; additionally, Defendant KCKCC receives federal financial assistance.  Defendant KCKCC may

be served at its aforementioned address by serving its chief executive officer pursuant to Fed.R.Civ.P. 4(j)(2), or "the clerk or secretary or, if not to be found, … any officer, director or manager" of Defendant KCKCC pursuant to K.S.A. § 60-304(d)(4).

3.      Defendant Board is the Board of Trustees for Defendant KCKCC and performs all their duties and obligations at the principal place of KCKCC located at 7250 State Ave., Kansas City, Kansas 66112; additionally, by and through KCKCC, Defendant Board receives federal financial assistance. Defendant Board may be served at its aforementioned address by serving its chief executive officer pursuant to Fed.R.Civ.P. 4(j)(2), or "the clerk or secretary or, if not to be found, … any officer, director or manager" of Defendant KCKCC pursuant to K.S.A. § 60-304(d)(4).

4.      Defendant KCKCC has employed Plaintiff from 1992 to present.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, which gives district courts jurisdiction over all civil actions arising under the Constitution, laws and treaties of the United States.

6.      This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over (a) any civil action authorized by law to be brought by any person to redress deprivation, under color of any State Law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

7.      Further, this Court has jurisdiction pursuant to 28 U.S.C. § 1367 as it has original jurisdiction over this matter as outlined above.

8.    Plaintiff brings this action to redress a hostile educational environment pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), as more fully set forth herein.

9.    This is also an action to redress the deprivation of Plaintiff's Constitutional rights under the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.

10.    Venue is proper under 28 U.S.C. § 1391(b) because all parties reside in this judicial district and the events giving rise to the claims asserted herein occurred within the district.

## APPLICABLE LAW AND POLICY

11.    Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), states that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…

20 U.S.C. § 1681.

12.    Title IX is implemented though the Code of Federal Regulations. See 34 C.F.R. Part 106.

13.    34 C.F.R. § 106.8(c) provides:

> (c) Adoption of grievance procedures. A recipient must adopt and publish grievance procedures that provide for the prompt and equitable resolution of student and employee complaints alleging any action that would be prohibited by this part…

34 C.F.R. § 106.8.

14.    In *Fox v. Pittsburg State University*, 257 F.Supp.3d 1112 (D. Kan. 2017), the United States District Court for the District of Kansas held that Title IX is applicable in employment discrimination claims.

15.    Further, in *Fox*, the Court followed the majority in holding that a private right of action exists under Title IX for employees of educational institutions receiving federal funding that are alleging discrimination. *Id*.

3

16.     Additionally, in *North Haven Board of Education, et al., v. Terrel H. Bell., Secretary of Education, et al.*, 456 U.S. 512 (1982), the United States Supreme Court came to the same conclusion that Title IX should be interpreted to protect employees of educational institutions receiving federal funding.

17.     In *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005), the United States Supreme Court held that retaliation against an individual because that individual complained of sex discrimination is a form of sex discrimination protected by Title IX and is encompassed in Title IX's private cause of action.

18.     In *Mehus v. Emporia State University*, 295 F.Supp.2d 1258 (D.Kan. 2004), the United States District Court for the District of Kansas held that for a plaintiff to state a cause of action under Title IX, the plaintiff must allege:

(1) she was excluded from participation in, denied the benefits of, or subjected to discrimination in an educational program;

(2) the program receives federal assistance; and

(3) the exclusion was on the basis of sex.

*Mehus v. Emporia State Univ.*, 295 F. Supp. 2d 1258, 1271 (D. Kan. 2004).

19.     *Mehus* further held that plaintiff is not required to show that the discrimination was intentional. *Mehus*, 295 F.Supp.2d at 1271.

20.     In *Fitzgerald v. Barnstable School Committee*, 555 U.S. 246 (2009), the United States Supreme Court held that Title IX does not preclude an action under § 1983 alleging unconstitutional gender discrimination.

21.     The Fourteenth Amendment to the United States Constitution provides in pertinent part that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

22.     Defendant KCKCC has adopted Discrimination and Harassment Procedure 5.00.0.

That policy defines "Discrimination", "Harassment" and "Hostile Environment" as follows:

**Discrimination**
Discrimination is the denial of opportunity to, or adverse action against, a person because of that person's race, color, religion, national origin, age, disability, sex/gender (to include orientation, identity or expression), military/veteran status or any other characteristic protected by law and/or KCKCC policies. Actions or policies that provide unequal opportunity or adversely affect the terms and conditions of a person's employment or learning environment at KCKCC and which are motivated or based, in whole or in part, upon any of the foregoing categories can constitute discrimination in violation of KCKCC's non-discrimination policy.

**Harassment**
A form of discrimination that occurs when verbal or physical conduct based on an individual's protected status unreasonably interferes with that individual's work performance or creates a hostile work environment for that individual, including affecting their personal safety or participation in college- sponsored activities.

> **A. Hostile Environment -**Unwelcome conduct by an individual(s) against another individual based upon protected category/status that is sufficiently severe or pervasive that it alters the conditions of employment and creates an environment that a reasonable person would find intimidating, hostile, or offensive. The determination of whether an environment is hostile must be based on all of the circumstances. These circumstances could include the severity of the conduct, the frequency, and whether it is threatening or offensive.

23.     Defendant KCKCC has also adopted Non-Discrimination Policy, Policy 5.02,

which states the following:

Kansas City Kansas Community College (KCKCC) is committed to promoting and sustaining a campus community which identifies and values the individuality of every community member and is dedicated to maintaining a positive environment where diversity and inclusion is encouraged and fostered throughout the college.

KCKCC prohibits discrimination against any member of the College community on the basis of race, color, religion, national origin, age, disability, sex/gender (to include orientation, identity or expression), military/veteran status or any other characteristic protected by law. KCKCC will conduct its programs, services and activities consistent with applicable federal, state and local laws.

24.    Additionally, Plaintiff is unaware of any grievance procedure that has been adopted and published by Defendants, as required by 34 C.F.R. § 106.8. other than the "draft" policy titled "Kansas City Kansas Community College Interim Title IX Policy".

25.    Regardless, Defendants' draft policy states:

KCKCC is committed to providing a non-discriminatory and harassment-free educational, living and working environment for all members of the campus community, including students, faculty, and staff.

Title IX of the Education Amendments Act of 1972 is a federal law that states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

This policy prohibits all forms of sexual or gender-based harassment, sexual violence, and stalking.

## FACTS COMMON TO ALL COUNTS

26.    At all times material, Defendants were and are receiving federal funding, as contemplated by Title IX, 20 U.S.C. § 1681, *et seq.*

27.    Defendants implemented and executed policies and customs in regard to the events that resulted in the deprivation of Plaintiff's constitutional, statutory, common law, and contractual rights.

28.    Defendants are responsible for ensuring that all their employees are properly qualified, trained and supervised to perform their jobs.

29.    Defendants are responsible for the acts and omissions of its employees.

30.    At all times material, Plaintiff was and is a female, single mother, and employee of Defendant KCKCC with tenure.

31.    Plaintiff earned her Bachelor of Arts in Human Resources from the University of Kansas in 1989.

32.     In 1992, Plaintiff received her Juris Doctor from the University of Kansas School of Law.

33.     Plaintiff began working as a professor for Defendant KCKCC in 1992 as an adjunct Professor for the Business Division, was hired as a full-time 182-faculty[1] member in August 1993 and has been continuous employed by Defendant KCKCC since that time.

34.     Plaintiff currently coordinates the Paralegal Program, which is under the academic division of Social and Behavioral Sciences & Public Services (sometimes referred to as "Social Science Division").

35.     At all times during her employment, because of her experience and education in law, Plaintiff has been qualified to teach all Paralegal courses, Business Law I and II, and all law courses in the Criminal Justice program.

36.     In May of 2018, because of reorganization of KCCC, Plaintiff learned that the Paralegal Program was being moved back to the Social Science Division from the Business Division.

37.     In August of 2018, Cleon Wiggins ("Wiggins") became Plaintiff's supervisor as Dean of Social and Behavioral Sciences & Public Services.

38.     Upon information and belief, Wiggins does not have a Juris Doctor degree or any experience in the legal field.

39.     In June of 2018, before Wiggins became Plaintiff's supervisor, Plaintiff initiated a meeting with Wiggins to discuss a plan of action because Plaintiff had personal issues regarding challenges with picking up children as a single mom.

---

[1] 182-faculty are full-time faculty members that are employed pursuant to the Master Contract, as mentioned below.

40.    Plaintiff requested this meeting to explain her situation and assure Wiggins that she was committed to her work, but also to inform him there were some personal situations that she could not avoid.

41.    During this meeting, Wiggins was very kind and understanding and seemingly wanted to assist Plaintiff in making sure she could effectively perform the duties of her job while allowing her to attend to her personal needs as a single mother.

42.    Additionally, Plaintiff shared details of efforts already made toward effectuating potential changes to improve the Paralegal Program (sometimes referred to as the "Program") enrollment, including changes recommended by the Paralegal Advisory Board, to get Wiggins feedback and support; specifically, Plaintiff suggested a new name for the Program as well as taking advantage of SB155's opportunities by offering classes in the local high schools.

43.    Wiggins acknowledged the recommendations in an email to Plaintiff on June 20, 2018.

44.    During the convocation meeting for the Spring 2019 semester, Plaintiff learned of an emergency situation involving her youngest son and took leave to attend the emergency.

45.    Two weeks later, Plaintiff was informed of another situation involving her middle child.

46.    Plaintiff knew the challenges with her children would be continuing in nature and inquired with her Kansas National Education Association ("KNEA") union representative and the College Human Resources department ("HR") regarding her options with the Family Medical Leave Act or other leave to minimize her obligation on campus allowing her to give proper attention to her children.

47.    None of the leave options presented would allow Plaintiff to continue getting paid during such leave time, and as a single mother, foregoing pay was not possible.

48.     Therefore, Plaintiff informed her supervisor, Wiggins, she would likely be exercising paid leave on a more frequent basis but assured Wiggins that she was committed to her position at the College.

49.     Further, Plaintiff disclosed extremely personal information regarding her children and the nature of the situation which would warrant her not spending extra time on campus for the foreseeable future.

### Assignment to Program Review Committee

50.     Approximately three weeks after this meeting and conversation with Wiggins, Wiggins assigned Plaintiff to an additional committee on campus, the Program Review Committee.

51.     At the time Wiggins assigned Plaintiff to the Program Review Committee, she was already involved with one campus committee that typically met once per month.

52.     The Program Review Committee held meetings on Wednesday afternoons at 2:30, one to two times per month for up to two hours.

53.     Unfortunately, 2:30 was the time Plaintiff needed to leave to pick up her youngest son from school and Wiggins understood this.

54.     Moreover, the Program Review Committee was the only committee that reports attendance to the deans because most of the attendees are tech staff who are on duty during the duration of this committee meeting and otherwise would be working at their desks; as a faculty member, Plaintiff's contractual time requirements are different and not hourly in nature.

55.     Plaintiff objected to being assigned to this specific committee and reminded Wiggins of their conversation and of her challenges at home which would require her to exercise more paid leave options; additionally, Plaintiff inquired if there was another committee she could join that met at a time whereby she could still be available for childcare for her children.

9

56.    Regardless of Plaintiff's objections and reasons thereto, Wiggins insisted that Plaintiff sit on the Program Review Committee stating it would be good for her because the upcoming year required completion of a self-study from the Program.

57.    Under the MASTER CONTRACT Between THE BOARD OF TRUSTEES Kansas City Kansas Community College and THE FACULTY ASSOCIATION OF KNEA Kansas City Kansas Community College (the "Contract"), committee meetings are not specifically required for faculty members, but Wiggins required Plaintiff to attend regardless.

58.    Since such meetings are not required of faculty, if Plaintiff could not attend the meeting, she could not take leave because no contractual leave applied.

59.    Knowing her obligations to her children, Plaintiff met with the committee chairperson to explain the situation and the need for her to care for her child, and he assured her that she could review the minutes for the meetings and the minutes would be sufficient for any preparation for the self-study of the Program during the upcoming year.

60.    Plaintiff attended the committee meeting infrequently but read the minutes and prepared the self-study for the Program and submitted it on time in May 2020.

61.    After Plaintiff's submission of the self-study for the Program, which was the reason Wiggins told Plaintiff she was to sit on the Program Review Committee, it was her understanding that her service to this committee was complete and therefore discontinued such service.

62.    In October 2020, the Program self-study was peer reviewed via Zoom meeting and during the meeting Plaintiff was present to engage in discussion and questioning.

63.    During the meeting, Plaintiff was questioned regarding statements she made in the self-study specifying challenges with the Program and Plaintiff responded that she was in need of administrative support to go forward with the advisory committee recommendations.

10

64.     Plaintiff went on to explain that (1) she began discussing a plan for progressing the Program with her dean in June 2018 and that those discussions were continuing; (2) that she needed her dean's assistance in approving class offerings at the high school; and (3) she needed her dean's assistance to attain alignment with Kansas Board of Regents' (sometimes referred to as "KBOR") 60-credit hour recommendations for associate programs (which required approval through the Academic Policies Committee), but had yet to receive such support or assistance.

65.     Unbeknownst to Plaintiff, Wiggins was on the Zoom meeting the whole time.

66.     At the subsequent coordinator and division meeting, Wiggins asserted that, while he was "not naming any names" of people who tried to blame lack of program success on him, those people would "not get the desired help" and "would not be happy" about the repercussions.

67.     Plaintiff heard this statement as a veiled threat directed solely toward her.

68.     In December 2020, Wiggins scheduled a disciplinary Zoom meeting to discuss Plaintiff's failure to attend Program Review Committee meetings, claiming that she was being insubordinate by her failure to attend.

69.     Wiggins prepared a Letter of Reprimand to be placed in Plaintiff's HR file for what he claimed to be insubordination.

70.     During the meeting Plaintiff explained to Wiggins that it was her understanding that her service involving the Program Review Committee ended in May after she submitted her self-study for the Program.

71.     Additionally, Plaintiff reminded Wiggins that she was willing to participate in other committees with different meeting times, that she had no intent of insubordination, and was fully intent on and committed to fulfilling her obligations under the Contract, which did not require her to sit on any committees.

72.    Plaintiff further inquired as to Wiggins' procedures for assigning faculty to committee assignments rather than allowing faculty to volunteer as was Plaintiff's experience with all previous supervisors at KCKCC, and further inquired about other committee meeting times, and who else Wiggins had assigned to serve on committees, because, as to Plaintiff's knowledge, no other coordinators in the division have been assigned committees.

73.    Wiggins responded that he wouldn't "go down that rabbit hole."

**Wiggins plan to move faculty offices.**

74.    In June of 2019, during summer break, Wiggins sent an email to faculty requesting feedback on his plan to move several faculty offices.

75.    As Plaintiff had moved offices several times over the years and is one of the most senior faculty members on campus, and such seniority used to mean something before Wiggins became dean, Plaintiff objected to the plan proposed and offered an alternative solution that achieved his stated objective.

76.    Wiggins refused to engage in discussion and asserted his plan was best.

77.    A couple of months later, in August of 2019, Plaintiff had a meeting with the now former Vice President for Academic Affairs ("VPAA"), BethAnn Krueger, whereby she discussed her issues with the office moves and relayed how Wiggins' behavior was creating a hostile environment in which Plaintiff, as a female and single mother, felt singled out and targeted.

78.    Additionally, Plaintiff told the VPAA that the proposed office move would place her office directly adjacent to Wiggins' office which made her uncomfortable and anxious as she believed such an office location would subject her to further discriminatory treatment by Wiggins.

79.    The VPAA said she would look into the situation but later followed-up by email suggesting Plaintiff talk with HR and did nothing.

80.    Pursuant to the VPAA's suggestion, Plaintiff scheduled a meeting with the faculty liaison, Sean Burkett, whereby she reported the hostile work environment to Sean Burkett, and again, nothing was done.

81.    During the first week back on campus, Wiggins insisted that Plaintiff pack up her office for the Fall 2019 semester.

82.    After Plaintiff consulted her KNEA representative who assured Plaintiff that Buildings and Grounds staff were the appropriate personnel to move the office, Plaintiff packed up her personal belongings and went to a nearby common area on campus to make herself available to students during the move.

83.    Plaintiff then received an email from Wiggins asserting that Plaintiff did not have permission to work outside of her office, despite the fact the Contract does not specify where faculty members must spend their contracted hours and despite the fact that 182-faculty have had the freedom to move about campus as they please the entirety of Plaintiff's career at KCKCC.

84.    Thereafter, in September of 2019, Wiggins scheduled a disciplinary meeting asserting that Plaintiff was insubordinate by not packing up her office and went as far as presenting pictures of Plaintiff's previous office with books on the shelves as evidence of such insubordination.

85.    When office moves actually occurred, Wiggins arbitrarily moved a male faculty member from the same office suite as Plaintiff into Plaintiff's previous office, giving preferential treatment to the male faculty member, despite Plaintiff having many more years of seniority.

86.    Plaintiff had a KNEA representative, Ernie May, accompany her to the meeting and the representative informed Wiggins that faculty members are not hired to be movers and the Contract did not require or suggest faculty engage in such activity.

87.     Moreover, during this meeting Plaintiff attempted to address the issues surrounding her attempt to communicate directly with Wiggins regarding various faculty obligations and efforts and how Plaintiff felt the tone and substance of Wiggins emails came off hostile, harassing, discriminatory and caused her anxiety.

88.     Upon hearing Plaintiff's feelings, Wiggins rose up out of his chair and demanded Plaintiff show him the emails to which Plaintiff replied that since he was on all of the email chains, he had access to the emails.

89.     After this meeting, Plaintiff's KNEA representative, who had witnessed the exchange between Wiggins and Plaintiff, urged Plaintiff to file a Title IX action, or at the very least, a grievance.

90.     Further, the KNEA representative suggested that several women in the Social Science division had reached out to him having the same or similar concerns as Plaintiff regarding Wiggins disparate treatment against the women in the department.

91.     After this exchange with the KNEA representative, Plaintiff considered taking such actions, but feared retaliation and increased threats from Wiggins.

**Class cancellations and coordinator issues.**

92.     In January 2019, Plaintiff asked Wiggins to add the Internship I and II courses to the spring schedule to accommodate a paralegal student who needed the classes to graduate and recently found a sponsor for her internship.

93.     Wiggins objected to the student's concurrent enrollment in both internships, despite Plaintiff explaining that the student's internship would be continuous with one sponsor and the student would be able to complete all required course hours.

94.     Wiggins refused to acknowledge Plaintiff's previous, extensive experience and refused to consider the fact previous deans had all deferred to her education and experience and approved such a course.

95.     All previous deans would regularly defer to Plaintiff's expertise and experience as a practicing attorney and program coordinator who works directly with the students.

96.     Wiggins, with no legal education and/or experience, gave no actual, practical reason for not adding the course, but mentioned "policies" without referring to specific policies.

97.     Additionally, Wiggins stated a degree audit must be completed before enrollment in internships, yet this has never been policy or practice in the past and Wiggins gave no reason as why it was necessary.

98.     Wiggins does not behave in the same fashion with Plaintiff's male counterparts and regularly defers to their education and experience, allowing them to run their programs as they see fit.

99.     Additionally, in 2019, Plaintiff was scheduled to teach four 8-week courses for the Paralegal Program; two were to begin in January and two were to begin in March, after spring break.

100.    Even though the courses were experiencing low enrollment and in danger of being cancelled, after Plaintiff's advocation for her students who were scheduled to graduate in May, Wiggins approved the courses to continue.

101.    As Plaintiff was advocating for her students and Wiggins subsequently made the decision to approve the courses to continue, Plaintiff explained to Wiggins that the students taking the first 8-week courses would also be taking the second 8-week course, therefore enrollment in the second 8-week courses would be low as well.

102.   Wiggins indicated he understood the second 8-week courses would not have additional enrollment.

103.   Yet, during spring break, when Plaintiff was off duty, she received an email from Wiggins stating the second 8-week courses were going to be cancelled.

104.   Plaintiff, during her time off, replied to Wiggins by forwarding email communication from January whereupon Plaintiff believed this situation had been resolved and reminded Wiggins that if the classes were cancelled the students would not graduate in May.

105.   Wiggins responded by inquiring if degree audits were on file for the students and after Plaintiff's investigation, she discovered no audits were on file because the graduation check (when degree audits needed to completed) deadline was not until April.

106.   Plaintiff shared with Wiggins the graduation check deadline and he continued to insist that the courses would be cancelled without the "degree audit proof."

107.   Plaintiff contacted an advising staff member (as staff members do not have a scheduled spring break like faculty) to see if she could prepare degree audits for the students as Plaintiff was on spring break in Florida.

108.   As it turns out, the staff member was on vacation that week as well, so Plaintiff having no other choice to advocate for her students, prepared the degree audits herself, sent them to Wiggins and renewed her request he not cancel the courses.

109.   Upon receiving the degree audits evidencing the students' May graduation date and Plaintiff's renewed request, Wiggins still cancelled the courses within days of them set to begin.

110.   Plaintiff continued to request Wiggins reinstate the courses, especially after receiving panicked emails from the students about not being able to graduate.

111.    Wiggins initially refused but required the advising staff member to send him the same degree audit documentation showing the students' expected May graduation as Plaintiff had previously sent him.

112.    Prior to Wiggins requiring the information from the advising staff member, Wiggins had never requested the advising staff member get involved; Plaintiff requested her assistance because Plaintiff was on vacation.

113.    Wiggins basically used the advising staff member, who has no supervisory authority over Plaintiff or the Paralegal Program, to check and affirm Plaintiff's work.

114.    Only after the advising staff member checked and affirmed Plaintiff's work did Wiggins reinstate the courses allowing the students to graduate in May.

115.    After this situation, Plaintiff scheduled a meeting with Wiggins to discuss his objective and rationale for cancelling the courses despite her producing the requested documentation to him during spring break.

116.    Wiggins responded by insisting Plaintiff agree there "had never been a problem between us, Kathryn" and that "I probably should have just called you. I'm not really good at email."

117.    Additionally, Plaintiff scheduled another meeting with the faculty liaison in Human Resources to discuss the multiple problems Wiggins was presenting.

118.    The Human Resources staff member suggested there were simple miscommunication issues and Wiggins had done this several times.

119.    The Human Resources staff member dismissed Plaintiff's concerns that Wiggins' behavior was problematic, and that Wiggins was creating a hostile work environment for female faculty in the Social Science division.

120.    Instead of investigating, the HR staff member dismissed any type of wrongdoing alleged by Plaintiff, who, in all her years being employed by KCKCC has never reported sexual harassment and/or discrimination against another employee

121.    In the Spring of 2020, a similar situation occurred with internship courses. Students found internships at the beginning of the semester, but Wiggins claimed it was too late to add them to the full semester classes.

122.    Yet, Wiggins has the ***discretion*** to add the students to the full semester classes.

123.    Instead, Wiggins agreed to add the courses to the second 8-week term starting March; yet, in March, he ***cancelled*** the internships for low enrollment.

124.    Wiggins continues to cancel the internships, which only serves to damage Plaintiff as she is paid ***per student*** and there is ***no minimum*** enrollment in internships.

125.    Now, Wiggins argued that the students shouldn't be enrolled in both internships despite having agreed to the same situation with the students in January.

126.    Wiggins refused to even engage in further conversation regarding this issue and both his and the preceding deans' previous practice.

127.    Wiggins continues to undermine Plaintiff's position as the Paralegal Program coordinator and her relationships with the students.

128.    Additionally, Wiggins refuses to engage in discussion and instead, becomes loud, demanding, and standoffish.

129.    Furthermore, in the Spring of 2020, Wiggins objected to Plaintiff's class offerings, again, with no legal background or experience.

130.    Yet, Wiggins never questions male colleague's expertise and experience in deciding and planning which classes to offer.

## **Assigning night classes.**

131.    In the Fall of 2019, Wiggins required Plaintiff to schedule a night class even though paralegal night classes have not made minimum enrollment since the early 2000's.

132.    Plaintiff complied with the request and scheduled a night class naming a previous paralegal adjunct instructor as the instructor for the night class.

133.    Wiggins objected to the adjunct being named the instructor and informed Plaintiff that she needed to post the job.

134.    Again, Plaintiff complied with Wiggins' request only to have Wiggins object to the job requirements posted with no explanation.

135.    Plaintiff repeatedly asked for direction, was not given any, and was eventually assigned to instruct the course by Wiggins.

136.    Plaintiff again reminded Wiggins of her family obligations as a single mother and stated that she was unable to teach a night class; Plaintiff even forward Wiggins the communication regarding the adjunct request.

137.    Wiggins failed to even respond to Plaintiff, ignoring her requests and obligations as a single mother.

**Wiggins' affirmative efforts to discourage and halt Program improvements and proposed changes to comply with KBOR recommendations.**

138.    Additionally, in the Fall of 2019, Plaintiff was voicing her frustration stemming from the lack of assistance from Wiggins regarding: (1) moving forward with getting the Paralegal Program into area high schools to take advantage of SB 155 provisions that would push more traditional students into the Program; and (2) moving forward with the changes to the Program to make it more accessible with respect to course offerings as well as to comply with KBOR recommendations to have 60 maximum credit hours for Associate Degrees as the Program was no closer to achieving either objective than when Plaintiff first mentioned the objectives to Wiggins in June 0f 2018.

19

139.    As Plaintiff voiced such frustrations, a male colleague, who is also in the Social Science division and sits on the Academic Policies Committee ("APC") informed Plaintiff she could ask Wiggins to present the changes to the Dean's Council so that Plaintiff could in turn present them to APC for advice.

140.    The behavior displayed at division meetings made clear that the male colleague and Wiggins had a very friendly and professional relationship and when the male colleague requested Wiggins present changes to his program to the Dean's Council, Wiggins willingly obliged.

141.    Plaintiff subsequently had in informal presentation at the APC and was given advice and direction on how to proceed with her proposed changes.

142.    Moreover, Plaintiff discussed the changes with the Paralegal Advisory Board, but because of the challenges surrounding COVID, a formal presentation to the APC was not possible until October of 2020.

143.    As October of 2020 approached, procedure required Wiggins present the changes to the Dean's Council before Plaintiff could make a formal presentation to the APC.

144.    Despite willingly agreeing to the male colleague's request on Plaintiff's behalf for APC review of her changes to the Program just a year prior, Wiggins refused to present Plaintiff's proposed changes to the Dean's Council, stating in an email that he did not agree with the changes despite his complete lack of any legal education or experience and Plaintiff's accompanying support of the Paralegal Advisory Board and their agreement with such changes.

145.    Wiggins further asserted that he had never been made aware of Plaintiff's desire to make changes, yet Wiggins and Plaintiff had a conversation regarding such changes in June 2018 and Wiggins engaged in email communication with Plaintiff regarding such changes beginning in February 2019 continuing through the fall of 2019.

**<u>Refusal to honor law degree, teaching qualifications, teaching experience, previous practice, HLC policies, and the Contract</u>**

146.    Again, in August 2019, one week before the semester began, course cancellations caused Plaintiff to be short of the required contractual teaching load under the Contract.

147.    The Contract provides for any full-time faculty member (Plaintiff) short on their teaching load to request to teach a course slated to be taught by an adjunct to meet the contractual required load.

148.    After consultation with the now former Criminal Justice Program Coordinator, Kevin Steele, Plaintiff requested Wiggins assign her courses within the Criminal Justice department for which she is qualified to teach, and which adjunct faculty were assigned.

149.    Wiggins refused to allow her to teach courses for which she was qualified and had taught before stating the Criminal Justice Program Coordinator was required to "make contractual load" before Plaintiff could request any classes within that program.

150.    Wiggins' statement does not align with the Contract nor is it factually correct as Mr. Steele was employed as a 212-faculty[2] member and did not have contractual load requirements whereas Plaintiff, employed as a 182 faculty member is contractually required to teach 30 credit hours per year.

151.    Plaintiff subsequently alerted her KNEA representative of Wiggins' statements and actions and included the VPAA of the discriminatory behavior by copying her on an email chain whereupon Plaintiff renewed her request to add the Criminal Justice courses to her teaching schedule pursuant to the Contract.

152.    Plaintiff was assigned the requested courses with no further communication from Wiggins.

---

[2] 212-faculty are have hours in which they are required to be campus at their work space, whereas, 182-faculty do not have the same requirements.

153.     In the Spring of 2020, Plaintiff again taught Criminal Justice courses at Wiggins' request as the Criminal Justice Coordinator resigned and Plaintiff was qualified to teach such courses.

154.     In the Fall of 2020, Plaintiff again needed to pick up courses to meet her contractual load and requested to teach Criminal Justice courses again, as she has done her entire career at KCKCC.

155.     But, in the Fall of 2020, with a new Criminal Justice Coordinator who lacked tenure, Wiggins emailed Plaintiff with a new assertion that Plaintiff was not qualified to teach Criminal Justice courses, claiming she did not meet the Higher Learning Commission's ("HLC") qualifications and supplied a lengthy analysis and explanation attacking her doctorate degree transcript and previous experience[3], concluding that Plaintiff's education and experience did not support her being qualified to teach such courses[4].

156.     Prior to the aforementioned email, there was no discussion and/or inquiry from Wiggins regarding Plaintiff's qualifications.

157.     The HLC policy statement cited by Wiggins states a faculty member is considered qualified to teach if the faculty member holds a "relevant" or "related" degree at least two degrees higher than the course being taught; so, a faculty member holding a doctorate may teach bachelor degree courses or below.

158.     Thus, there is no need to do extensive research or evaluation on Plaintiff's transcript as she hold a juris doctor, a doctorate degree in law, which is both related and relevant to Criminal Justice.

---

[3] Wiggins only used Plaintiff's experience from 2018 forward in his evaluation, despite the fact Plaintiff has been employed by and teaching at KCKCC since 1992.
[4] The specific classes Plaintiff was requesting to teach, while Criminal Justice courses, are more related to law and legal theory rather than corrections.

159.    As such, Plaintiff replied to Wiggins email objecting to the evaluation, citing the HLC policy and explaining why she is and always has been qualified to teach Criminal Justice courses.

160.    Plaintiff copied the VPAA on her reply asserting objections yet nothing was done or said about the incorrect evaluation of Plaintiff's qualifications.

161.    Further, Wiggins claims that because her law school transcript did not reveal any Criminal Justice courses, she was not qualified.

162.    Plaintiff's law school transcript did however reveal that she took and passed Criminal Law and Criminal Procedure, but Wiggins did not see these courses as "relevant" or "related" because they are not "criminal justice" courses.

163.    Oddly, Plaintiff's law school transcript is devoid of any paralegal courses, but Wiggins never questioned her qualification for teaching those courses.

164.    Plaintiff objected multiple times to the notion she was not qualified as she's been teaching those courses for decades.

165.    In response to the incorrect evaluation, Plaintiff contacted her KNEA representative who reassured her that Wiggins claim she was not qualified to teach Criminal Justice courses was incorrect.

166.    Plaintiff then scheduled a meeting with the interim VPAA, Jerry Pope, in hopes of obtaining support for enforcing the Contract and having her qualification to teach evaluated correctly.

167.    Prior to the meeting with Mr. Pope, Plaintiff spoke with the new coordinator of the Criminal Justice Program and inquired as to if she would add Plaintiff's names to the courses and she agreed to tell Wiggins that Plaintiff could teach the requested Criminal Justice courses.

168.    During the meeting, the interim VPAA stated he would speak with the new coordinator about the issue, but no further communication was had and Plaintiff was not assigned the requested courses.

169.    In January of 2021, Plaintiff emailed Wiggins renewing her objections to his evaluation of her qualifications and attached a discovered document prepared by Ed Kremer, PH.D., a previous dean of Plaintiff, in anticipation of an upcoming HLC campus visit for continuing accreditation.

170.    The document specifically stated that Plaintiff holds a Doctorate degree in law and as such is qualified to teach all law classes at KCKCC[5], including classes in the Paralegal Program, Business Law I and II, and Criminal Justice courses.

171.    As further support for her qualifications, Plaintiff mentioned the two previous Coordinators of the Criminal Justice Program continuously requested Plaintiff to teach courses in their program throughout tenure and would not have done so if they believed Plaintiff was unqualified.

172.    Wiggins replied that the HLC document prepared by Dr. Kremer was not helpful or dispositive regarding Plaintiff's qualifications and further claimed that the previous coordinate, Mr. Steele, who continuously requested that Plaintiff teach Criminal Justice courses, did not believe Plaintiff was qualified.

173.    Interestingly, Mr. Steele held bachelor's degree in Public Administration, not Criminal Justice, but Wiggins never conducted an evaluation of his education and experience to decide whether he was qualified to teach certain courses; instead, Wiggins just assumed Mr. Steele was qualified.

**<u>Discriminatory treatment regarding discretionary decisions.</u>**

---

[5] KCKCC is a community college for which the highest degree conferred is an associates degree.

174.   In August of 2021, the week prior to faculty return, the President of KCKCC communicated updated COVID protocols for the entire campus.

175.   With such protocols in place, Plaintiff made a doctor's appointment to document a medical condition and request an accommodation from the HR department.

176.   Additionally, the President sent a Convocation/Welcome back agenda for the first week 182-faculty was to start work for the fall semester and the agenda showed all meetings for the week were being conducted virtually via Zoom or Teams.

177.   There was no mention of a requirement regarding where faculty were expected to attend the virtual meetings, as in previous semesters during COVID, and there was no communication from the division dean (Wiggins) regarding expectations that faculty be on campus during the week before classes.

178.   As such, Plaintiff believed there was still a desire to minimize personnel on campus, as evidenced by all meetings being conducted virtually and as had been the status quo since late spring 2020.

179.   On Wednesday, August 11, 2021, Wiggins communicated with Plaintiff that he expected her to be on campus.

180.   Plaintiff replied that she was waiting on a document from her doctor regarding an accommodation.

181.   But, because of Wiggins' communication, Plaintiff submitted sick leave requests for all her contracted time she could not prove attendance via Zoom sign in.

182.   Wiggins refused to accept Plaintiff's sick leave, instead challenging her submission and accusing her of using the time inappropriately and against sick leave policy, specifically claiming she was trying to account for the time she wasn't on campus rather than actually being sick.

183.    Plaintiff replied to Wiggins clarifying that she used her sick leave as she was waiting on medical documentation for her medical accommodation and she copied HR on that email to ensure HR would have notice of Wiggins' behavior singling Plaintiff out and harassing her.

184.    Wiggins replied, only to Plaintiff, leaving HR off the reply email, that he had already prepared a Letter of Reprimand, that HR had signed off on the letter, and Plaintiff was directed to schedule a meeting during the week of August 23, 2021, to discuss the letter.

185.    Plaintiff spoke with other 182-faculty in her department, none of which received direction regarding on-campus requirements from Wiggins or from administration.

186.    Additionally, none of the faculty in her division with whom she spoke were contacted by Wiggins regarding whether or not they were on campus.

187.    Furthermore, the 182-faculty members with whom Plaintiff spoke to stated they were working from home as further evidenced by their Zoom screen.

188.    Plaintiff attended a meeting to discuss the Letter of Reprimand on September 1, 2021, and when asked by Plaintiff's KNEA representative if Wiggins had inquired into other employees whereabouts, Wiggins replied that he did not go looking to see of other employees were on campus.

189.    Plaintiff was issued the Letter of Reprimand, which again, stated that she had been insubordinate.

190.    Notably, insubordination is one of very few ways to terminate a faculty member as faculty are well protected under the Contract from being arbitrarily terminated.

191.    Wiggins has now issued Plaintiff two Letters of Reprimand, neither of which involved clear policy or Contract violations, citing insubordination.

192.    Wiggins has never been disciplined for his sexual harassment/discrimination or his retaliation against Plaintiff.

193.    Defendants' actions have impaired Plaintiff's ability to progress the Program and continue advancing in her career as a professor at KCKCC.

**COUNT I**
**Title IX, 20 U.S.C. § 1681 – Sex Discrimination/Harassment**
**(Hostile educational environment)**

194.    The foregoing paragraphs are incorporated as though fully set forth herein.

195.    Defendant KCKCC does and has received federal financial assistance through Title IX during all relevant times mentioned herein.

196.    Accordingly, Defendants' entire operations are subject to the prohibition on sex discrimination under Title IX 20 U.S.C. § 1681(2)(A).

197.    Plaintiff was, and continues to be, harassed and subjected to humiliating and demeaning conduct at the hands of her supervisor, Dean Wiggins, based on her sex.

198.    The harassment and/or discrimination was and is so severe, pervasive, and objectively offensive that it and Defendants' failure to respond effectively constituted harassment/discrimination against Plaintiff on the basis of her sex.

199.    Defendants' officers with authority to take corrective measures had actual knowledge of the harassment/discrimination, actions and conduct of Wiggins.

200.    Despite having knowledge of the harassing, discriminatory and demeaning conduct on the basis of Plaintiff's sex, Defendants failed to take corrective measures.

201.    Defendants failed to remedy the hostile educational environment to which Plaintiff was exposed even after having notice of the harassment/discrimination which was occurring in its workplace.

202.    Any reasonable person would have felt that he or she was being subjected to a hostile educational environment due to Defendants' conduct in failing to effectively remedy the pervasive and severe sexual harassment/discrimination of which Plaintiff was exposed.

203.    Defendants acted with deliberate indifference to known acts of sexual harassment/discrimination toward Plaintiff.

204.    Defendants' acts and omissions constituted discrimination and indifference against Plaintiff on the basis of her sex.

WHEREFORE, Plaintiff seeks judgement in her favor and against Defendants, jointly and severally, on Count I of the Complaint, for an award of compensatory damages, for her costs and expended, reasonable attorneys' fees, and for such other relief as this Court deems just and proper.

## COUNT II
## Title IX, 20 U.S.C. § 1681 – Retaliation

205.    The foregoing paragraphs are incorporated as though fully set forth herein.

206.    Defendant KCKCC does and has received federal financial assistance through Title IX during all relevant times mentioned herein.

207.    Accordingly, Defendants' entire operations are subject to the prohibition on sex discrimination under Title IX 20 U.S.C. § 1681(2)(A).

208.    Plaintiff engaged in protected activities by complaining to the VPAA, BethAnn Krueger, Sean Burkett, VPAA, Jerry Pope, and directly to her supervisor, Cleon Wiggins about the harassment/discrimination and hostile work environment.

209.    Defendants retaliated against Plaintiff by not disciplining Wiggins, but instead, allowing Wiggins to write Plaintiff two letters of reprimand, forcing her to take sick leave, and allowing Wiggins to undermine the Program affecting Plaintiff's compensation.

210.    Defendants retaliated against Plaintiff by not following their own harassment/discrimination policy.

211.    Defendants retaliated against Plaintiff by allowing Wiggins to deviate from the Contract adversely affecting Plaintiff and her contractual rights thereto.

212.    Defendants have intentionally retaliated against Plaintiff for complaining about the harassment/discrimination and participating in protected activities in violation of Title IX.

213.    As a direct result of Defendants' unlawful retaliation, Plaintiff has suffered damages, lost wages and emotional and mental distress.

WHEREFORE, Plaintiff prays for judgement against Defendants, jointly and severally, on Count II of her Complaint, for a finding that she has been retaliated against based on her complaints of sexual harassment/discrimination and hostile educational environment; for an award of compensatory damages; for her costs expended; for reasonable attorneys' fees; and for such other and further relief as the Court deems just and proper.

Respectfully Submitted,

**DAVID R. SMITH, P.C.**

/s/ David R. Smith
David R. Smith, No. 13664
david@dsmith-law.com
4310 Madison Avenue, Suite 100
Kansas City, Missouri 64111
(816) 753-9393
Facsimile (816) 778-0957


**WEBSTER LAW, LLC**

/s/ Spencer J. Webster
Spencer J. Webster,    MO # 78795
swebster@sjwebsterlaw.com
4310 Madison Ave., Suite 100
Kansas City, Missouri 64111
(816) 898-6065

Attorneys for Plaintiff